# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONIQUE CANDOR,<br><br>                         Plaintiff,<br>     vs.<br><br>UNITED STATES OF AMERICA,<br><br>                      Defendant. | CASE NO. 13-CV-1044-LAB-WMC<br><br>**ORDER GRANTING GOVERNMENT'S MOTION TO DISMISS** |

Monique Candor, a lawyer, was owed a lot of money by a client, and she expected to be paid when the client sold her home.  Instead, the client settled a tax debt with the IRS.  Candor sued, claiming that her lien on the home was superior to the IRS's liens, and that she was due some of the sale proceeds.  Now before the Court is the Government's motion to dismiss because it is immune.

## I.     Legal Standard

"The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit."  *United States v. Sherwood*, 312 U.S. 584, 586 (1941).  Thus, the Government's motion challenges the Court's jurisdiction, and is brought under Fed. R. Civ. P. 12(b)(1).  *See Balser v. Dep't of Justice*, 327 F.3d 903, 908 (9th Cir. 2003); *Gilbert v. Da Grossa*, 756 F.2d 1455, 1458 (9th Cir. 1985).  This case can go forward only if the

Government has waived immunity, and the burden falls on Candor to demonstrate an "unequivocal waiver." *United States v. Park Place Assocs.*, 563 F.3d 907, 924 (9th Cir. 2009).

In considering a motion to dismiss under Rule 12(b)(1), the Court isn't limited to the four corners of the complaint as it is with a 12(b)(6) motion. *Americopters, LLC v. Fed. Aviation Admin.*, 441 F.3d 726, 732 n.4 (9th Cir. 2006). Rather, it can consider affidavits, declarations, and other evidence relevant to the its jurisdiction. *Rivas v. Napolitano*, 714 F.3d 1108, 1114 n.1 (9th Cir. 2013). It can also permit discovery to determine whether it has jurisdiction. *Laub v. United States Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003). But, the Government should only prevail here if the material jurisdictional facts aren't in dispute. *Casumpang v. Int'l Longshoremen's & Warehousemen's Union*, 269 F.3d 1042, 1060–61 (9th Cir. 2001).

## II.     Discussion

Candor invokes two provisions of the Internal Revenue Code that waive sovereign immunity and allow for taxpayers to sue the United States. The first is 26 U.S.C. § 7426(a)(1), the "wrongful levy" provision, which "provides a remedy for a person whose property is levied upon by the IRS for the purpose of satisfying another person's tax liability." *Compagnoni v. United States*, 173 F.3d 1369, 1370 n.3 (11th Cir. 1999). The second is 26 U.S.C. § 7426(a)(3). Under this provision, a taxpayer with an interest in property sold to satisfy a tax lien can sue for a share of the proceeds held under a "substituted sale proceeds" agreement.

### A.     § 7426(a)(1)

> If a levy has been made on property or property has been sold pursuant to a levy, any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States. Such action may be brought without regard to whether such property has been surrendered to or sold by the Secretary. 26 U.S.C. § 7426(a)(1).

To bring a wrongful levy suit against the United States, there must first be a levy.

*Denham v. United States*, 811 F.Supp. 497, 500 (C.D. Cal. 1992); *see also Wagner v. United States*, 545 F.3d 298, 301–02 (5th Cir. 2008).  "If the Government has not levied on property . . . the owner cannot challenge such a levy under 26 U.S.C. § 7426." *United States v. Williams*, 514 U.S. 527, 536 (1995).  The Government argues that there was never a levy on Candor's client's home, and that Candor's wrongful levy claim, for that reason, doesn't even get off of the ground.  The Court agrees.

Candor's complaint doesn't specifically allege that the IRS levied on her client's home.  The closest it comes is the allegation that "in or around July/August 2012, Taxpayer sold the property to satisfy federal levies and tax liens for not less than $300,000, against her real and personal property."  (Compl. ¶ 9.)  But a sale of property to pay a debt to the IRS is just that.  It isn't a levy.  "A levy forces debtors to relinquish their property.  It operates as a seizure by the IRS to collect delinquent taxes."  *United States v. Barbier*, 896 F.2d 377, 379 (9th Cir. 1990).  *See also* 26 U.S.C. § 6331(b) ("The term 'levy' as used in this title includes the power of distraint and seizure by any means.").  Candor's own allegations of a "levy," in her complaint and also in her opposition to the Government's motion to dismiss, don't match these definitions.

The most Candor seems able to allege is that her client, feeling pressure from the IRS, sold her home and used the proceeds to pay her tax bill.

> The facts clearly reveal that the bank and wage tax levies that the IRS served against Brown on January 26, 2012 created immediate havoc and chaos for Brown. Because the IRS agreed to release these levies, if Brown sold Crownhill and turned the sale proceeds over to the IRS, and if Brown paid the IRS substantial sums each month, Brown fired me and turned over to the IRS her wages and the Crownhill sale proceeds that she was already obligated to pay to me.  (Opp'n Br. at 7.)

That isn't a levy itself, though.  A number of courts have said so, particularly in the context of the IRS merely having a lien on property.  *See, e.g.*, *Wagner*, 545 F.3d at 302 ("Because the property in this case was subject only to a lien, not a levy, the district court had no jurisdiction to hear a wrongful levy claim."); *Crytser v. United States*, 274 Fed. Appx. 555, 557 (9th Cir. 2008) ("That Nina Crytser 'felt compelled' to pay Scott Crytser's assessed taxes with the proceeds of the sale of their residence to obtain discharge of the lien and avoid a

civil action by the purchaser for breach of contract does not convert the IRS lien into a levy."); *Interfirst Bank Dallas, N.A. v. United States*, 769 F.2d 299, 304–05 (5th Cir. 1985) ("In order for Section 7426 to apply, the IRS must have made an actual 'levy' upon the property in question; a threatened levy is insufficient . . . . [7426] clearly contemplates that a levy is a forcible means of extracting taxes from a recalcitrant taxpayer.  Consequently, no levy occurred here, where Condor transferred its accounts receivable to the IRS voluntarily."); *Bank of America, N.A. v. United States*, 663 F.Supp.2d 1308, 1314 (M.D. Fla. 2009) ("A necessary requisite for a wrongful levy is the existence of a levy . . . . 26 U.S.C. § 6331(b) defines a 'levy' as the power of distraint and seizure by any means.  To 'seize,' is to *forcibly* take possession of property . . . .  The receipt of funds, in itself, connotes no compulsion or seizure."); *Denham*, 811 F.Supp. at 501 ("Thus, in the present case no levy occurred because Plaintiff voluntarily made a payment to avoid IRS enforcement of its tax liens.").  Indeed, insofar as Candor claims in her opposition brief that her client arranged with the IRS "to sell Crownhill and turn the sale proceeds over to the IRS," by her own account there was no levy.  (Opp'n Br. at 1, 7.)  Had there been, the sale proceeds would have been seized rather than voluntarily "turned over."  *Barbier*, 896 F.2d at 379.

Candor has two responses to this.  The first is that there *were* levies—on her client's bank account and on her wages.  The second is that the United States should be equitably estopped from arguing that there was no wrongful levy because of the alleged misrepresentations of an IRS agent named Alan Pobre.

The first argument fails because the levies on Candor's client's bank account and wages were not levies on her home.  The wrongful levy statute, and the caselaw, are plenty clear that the levy must be on the actual property at issue.  *See* 26 U.S.C. § 7426(a)(1); *Bank of America*, 663 F.Supp.2d at 1314.  The statute reads "If a levy has been made on property or property has been sold pursuant to a levy, any person . . . who claims an interest in or lien on *such property* and that *such property* was wrongfully levied upon may bring a civil action against the United States."  The property Candor claims an interest in is her client's home, and there was simply no levy on "such property."  To the extent Candor wants

1  to argue that the levies on her client's bank account and wages left her with no choice but

2  to sell her home, for the reasons given above that's not a levy *on her home*.  *See Wagner*,

3  545 F.3d at 302 ("This court's opinion . . . suggests that nothing short of an actual levy is

4  enough to satisfy § 7426(a)(1).").  There is no evidence that the IRS served a levy on the

5  escrow company to collect the sale proceeds, and of course, Candor's own allegation is that

6  her client "turned over to the IRS . . . the Crownhill sale proceeds that she was already

7  obligated to pay to me." (Opp'n Br. at 7.  *See also* Compl. ¶ 9 ("Taxpayer sold the Property

8  to satisfy federal levies and tax liens for not less than $300,000, against her real and

9  personal property . . . .").)

10      The equitable estoppel argument is more complicated.  The essence of it is that

11  Candor contacted the IRS in May 2012, before her client's home sold in July or August, to

12  make a claim on the sale proceeds, and was told by Agent Pobre that her lien would be

13  respected and that sale proceeds wouldn't be dissipated without heeding her claim. (Compl.

14  ¶¶ 9–12.)  As a result, Candor didn't seek any kind of injunctive relief to enjoin the sale of

15  Crownhill or dissipation of the escrow funds, but before too long Crownhill had been sold and

16  the client had paid off her debt to the IRS with the sale proceeds. (Compl. ¶¶ 14–19.)

17      From his first contact with Plaintiff in June 2012, Pobre . . .
    promised that he would not allow Crownhill to be sold or escrow
18   distributed pending resolution and discussion of the merits of
     Plaintiff's claims. Plaintiff believed Pobre, and consequently she
19   did not seek injunctive relief from the Court, which she had
     intended and anticipated doing before Pobre lead her to believe
20   it was not necessary . . . .

21      Thereafter, when Plaintiff informed Pobre that Crownhill had
     sold, Pobre told Plaintiff he knew nothing about it, and that it was
22   contrary to his express instructions . . . . Nevertheless, Pobre
     assured Plaintiff she would suffer no harm from the wrongful
23   sale of Crownhill because the IRS had the funds and would hold
     them subject to Plaintiff's lien claims . . . .
24
     Pobre also repeatedly promised Plaintiff that the IRS would
25   consider and determine the merits of her claims and render a
     written decision.  Pobre also consistently assured Plaintiff that
26   her claims appeared meritorious.  (Opp'n Br. at 4–5.)

27  In other words, Candor was duped by Pobre into thinking the sale of Crownhill would work

28  out in her favor, and if she hadn't been duped she wouldn't be in the position of filing a

1  wrongful levy claim and facing a jurisdictional hurdle.  She even insists in her complaint that

2  Agent Pobre *himself* waived any defense to a wrongful levy claim:

3          Further, in August 2012, agent Pobre told Plaintiff that because
          the IRS had made a mistake by allowing dissipation of the Sale
4          Proceeds without his consent and approval given Plaintiff's
          pending claims, the IRS would consider Plaintiff's claims to be
5          a valid wrongful levy claim and the IRS waived and would not
          thereafter raise any defect in her wrongful levy claim, including
6          the IRS waived and would not raise any contention that there
          had not been a wrongful levy."  (Compl. ¶ 23.)

7
   This is obviously Candor's side of the story, and while the Court assumes there is another
8
   one, the Pobre declaration that the United States submitted is silent on the nature of his
9
   conversations, if any, with Candor.  The most it says it that "Candor . . . attempted to submit
10
   a claim for discharge of the Federal Tax liens to the IRS" and that the claim "was not
11
   considered as there was no agreement to set aside the proceeds of the sale pursuant to 26
12
   U.S.C. § 6325(b)(3)." (Pobre Decl. ¶9.)  In any event, Agent Pobre, by his own words, can't
13
   waive the sovereign immunity of the United States.  Only Congress can do that.  To the
14
   extent *that* is Candor's argument, it fails.  "Plaintiffs suing the United States must point to an
15
   'unequivocal expression' of intent to waive sovereign immunity.  A waiver of sovereign must
16
   be 'unambiguous,' and the relevant statutory language is to be 'strictly construed' in favor
17
   of the sovereign."  *United States v. Shell Oil Co.*, 294 F.3d 1045, 1051 (9th Cir. 2002).  Just
18
   as critical, "[i]t is hornbook law that jurisdictional requirements, such as the time period for
19
   filing refund claims, cannot be waived, altered, or amended by an IRS employee."  *Danoff*
20
   *v. United States*, 324 F.Supp.2d 1086, 1100 (C.D. Cal. 2004).
21
        It is another question, however, whether by Pobre's alleged assurances to Candor the
22
   United States can be equitably estopped from raising the defense of sovereign immunity.
23
   One way to answer this question–the short and sweet way—is to simply quote the statement
24
   in *Danoff* that "[c]ourts within the Ninth Circuit consistently have rejected application of the
25
   doctrine of equitable estoppel against the IRS."  *Id.* at 1101.  The other is to begin to run
26
   through the substantive analysis for estoppel, which requires "(1) knowledge of the true facts
27
   by the party to be estopped, (2) intent to induce reliance or actions giving rise to a belief in
28
   that intent, (3) ignorance of the true facts by the relying party, and (4) detrimental reliance."

*Bolt v. United States*, 944 F.2d 603, 609 (9th Cir. 1991).  "Additionally, when estoppel is sought against the government, there must be affirmative misconduct (not mere negligence) and a serious injustice outweighing the damage to the public interest of estopping the government."  *Estate of Amaro v. City of Oakland*, 653 F.3d 808, 813 (9th Cir. 2011).  The Ninth Circuit has recognized that equitable estoppel may be applied against the Government, but "with utmost caution and restraint, for it is not a happy occasion when the Government's hands, performing duties in behalf of the public, are tied by the acts and conduct of particular officials in their relations with particular individuals."  *Schuster v. Commissioner of Internal Revenue*, 312 F.2d 311, 317 (9th Cir. 1962).  In fact, the general rule is that "equitable estoppel is not available as a defense against the government, especially when the government is acting in its sovereign, as opposed to its proprietary, capacity."  *Johnson v. Williford*, 682 F.2d 868, 871 (9th Cir. 1982).

Against that background legal standard, the Court sees no basis on which to apply equitable estoppel in this case.  This is because by Candor's own allegations the dissipation of the Crownhill sale proceeds resulted from Pobre merely miscommunicating with another IRS agent, or perhaps just dropping the ball himself:

> Agent Pobre told Plaintiff he was unaware that the Property had sold, that he had given strict instructions that the Property was not to be sold without his consent and approval, and that the IRS had made a mistake as a result of miscommunication between agent Pobre and the agent charged with selling the Property. Among other things, agent Pobre told Plaintiff that the agent handling the Property had gone on a lengthy vacation and upon his return he apparently had forgotten agent Pobre's instructions not to allow the sale of the Property.

> Following the above conversation, agent Pobre for the first time gave Plaintiff the name and number of the IRS agent who handled the sale of the Property.  When Plaintiff asked the agent why the IRS had allowed the Property to be sold in light of her claims, including for a Certificate of Discharge and against the Sale Proceeds, the agent would only state that Plaintiff's claim was being handled "from agent Pobre's end."  (Compl. ¶¶ 17–18.)

If that's true—and the Court must accept that it is for the purposes of a motion to dismiss—that falls squarely within the definition of negligence, and well short of the kind of knowing misrepresentation required to apply equitable estoppel against the Government.

1    *Danoff*, 324 F.Supp.2d at 1101.  Indeed, in her complaint Candor offers no indication of what
2    Agent Pobre stood to gain from affirmatively misrepresenting her chances of receiving the
3    proceeds from the Crownhill sale.

4         In her opposition brief and supporting declaration, Candor does strengthen her
5    language, and accuses Pobre of making false promises "aimed at lulling Plaintiff into
6    believing he was protecting her rights to the Crownhill proceeds so she would not take action
7    herself until it was too late."  (Opp'n Br. at 4; Candor Decl. ¶¶ 18-22.)  That allegation is
8    largely missing from her complaint, however, and "[i]t is axiomatic that the complaint may not
9    be amended by the briefs in opposition to a motion to dismiss."  *Ruiz v. Laguna*, 2007 WL
10   1120350 at *7 (S.D. Cal. Nov. 21, 2013).  But even crediting it, the Court cannot find that
11   undocumented conversations with a low-level IRS agent are adequate to apply equitable
12   estoppel against the Government.  The Ninth Circuit has recognized, in a case of a World
13   War II veteran who joined the Army Reserve on the mistaken representation from recruiters
14   that he be eligible for a pension, that "[p]ersons dealing with the government . . . assume the
15   risk that government agents may exceed their authority and provide misinformation."  *Lavin*
16   *v. Marsh*, 644 F.2d 1378, 1383 (9th Cir. 1981).  The plaintiff "chose trust over caution," and
17   the Ninth Circuit refused to apply equitable estoppel to cover that choice.  *Id.* at 1383.

18        The same analysis applies here.  On the basis of mere conversations with Pobre,
19   presumably over the telephone, Candor didn't rush to court to either block the sale of
20   Crownhill or dissipation of escrow funds, which she claims she was prepared to do.  (Opp'n
21   Br. at 4.)  Moreover, the Ninth Circuit in *Schuster* held that equitable estoppel can't prevent
22   the IRS from correcting official pronouncements of law, which begs the question how it could
23   ever bind the IRS to the alleged statements of a low-level official.  *See Schuster*, 312 F.2d
24   at 318.  Finally, the court in *Danoff* declined to apply equitable estoppel against the United
25   States when a taxpayer received bad information about the statute of limitations for filing a
26   tax return because the plaintiff, a lawyer, "assumed the risk that the IRS employees might
27   provide misinformation" and "blindly rel[ied] those employees' alleged statements."  *Danoff*,
28   324 F.Supp.2d at 1102.  The very same thing can be said of Candor here.

1   For all of the reasons given above—particularly the high standard that Candor must

2   satisfy to justify the application of equitable estoppel *and* the lack of caselaw on her

3   side—the Court finds that the alleged statements of Agent Pobre are inadequate to estop

4   the Government from invoking its sovereign immunity and arguing that there was no wrongful

5   levy in this case.  Candor's wrongful levy claim is therefore **DISMISSED WITH PREJUDICE**.

6   The Court does not see a way for the claim to be amended and cured.  *Eminence Capital,*

7   *LLC v. Asopeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

8   **B.   § 7426(a)(3)**

9   If property has been sold pursuant to an agreement described
    in section 6325(b)(3) (relating to substitution of proceeds of
10   sale), any person who claims to be legally entitled to all or any
    part of the amount held as a fund pursuant to such agreement
11   may bring a civil action against the United States in a district
    court of the United States.  26 U.S.C. § 7426(a)(3).

12

13   Candor asserts her second claim under § 7426(a)(3), which comes into play "when

14   a property is sold privately, pursuant to an agreement to turn over to the Government funds

15   in exchange for discharging such property from federal tax liens."  *Bank of America*, 663

16   F.Supp.2d at 1313.  That agreement is defined by 26 U.S.C. § 6325(b)(3) in the following

17   way:

18   Subject to such regulations as the Secretary may prescribe, the
    Secretary may issue a certificate of discharge of any part of the
19   property subject to the lien if such part of the property is sold
    and, pursuant to an agreement with the Secretary, the proceeds
20   of such sale are to be held, as a fund subject to the liens and
    claims of the United States, in the same manner and with the
21   same priority as such liens and claims had with respect to the
    discharged property.

22   Candor's § 7426(a)(3) claim comes down to a simple question: Did her client have *an*

23   *agreement* with the IRS that she would sell Crownhill and pay taxes owed with the proceeds,

24   or did she do so on her own volition?   "[U]nilateral actions do not constitute an

25   agreement. . . ."  *Ticor Title Ins. Co. of California v. United States*, 1988 WL 383576 at *1

26   (C.D. Cal. Oct. 1, 1988).  Candor alleges that there was an actual agreement between her

27   client and the IRS: "Plaintiff is informed and believes and thereon alleges that in or around

28   July/August 2012, Taxpayer sold the Property to satisfy federal levies and tax liens for not

less than $300,000, against her real and personal property, and pursuant to written agreement with the IRS that the proceeds of the sale were to be held as a fund subject to the claims of competing lienholders." (Compl. ¶ 9.) (The Court would note that Candor also seems to allege that Crownhill was sold strictly to have the bank and wage levies lifted, not to have a federal tax lien on Crownhill discharged. If this is so, then presumably § 7426(a)(3) isn't implicated at all because bank and wage levies wouldn't necessarily attach to Crownhill itself. (*See* Opp'n Br. at 1; Candor Decl. ¶¶ 12, 15.).)

The Government denies that there was such an agreement, it seems resting entirely on Pobre's statement that "The IRS did not enter into an agreement pursuant to 26 U.S.C. § 6325(b)(3) with Brown." (Pobre Decl. ¶ 11.) The important part of that statement is the latter half: "pursuant to 26 U.S.C. § 6325(b)(3)." Pobre admits that "Brown voluntarily agreed to sell her property to avoid certain collections efforts by the IRS," and clarifies that the agreement was made pursuant to § 6325(b)(2)(A). (Pobre Decl. ¶¶ 5, 11; *see also* Reply Br. at 6 n.5 ("Moreover, Alan Pobre declared that the IRS entered into an agreement pursuant to 26 U.S.C. § 6325(b)(2)(A) with Brown.").) What the Government doesn't do is explain the difference between §§ 6325(b)(3) and 6325(b)(2)(A), and explain why the sale of Crownhill in this case falls under the latter.

The difference is straightforward. When the IRS discharges a lien under § 6325(b)(3), the lien remains attached to the proceeds of the sale. When it discharges a lien under § 6325(b)(2)(A), however, it discharges all interest in those proceeds "for value that is equal to the interest of the government in the part discharged." *Estate of John Frazier v. Internal Revenue Service*, 1992 WL 472026 at *9 (N.D. Ga. Oct. 14, 1992). As another court has put the distinction:

> Congress provided the IRS with two options for discharging a lien on property without waiving the right of the United States to priority payment. Under 26 U.S.C. § 6325(b)(3), the IRS discharges the property while expressly maintaining its right to the proceeds after the sale is complete. Under 26 U.S.C. § 6325(b)(2)(A), the IRS calculates its interest and collects the value of that interest in exchange for a discharge of the property. *Hannon v. City of Newton*, 820 F.Supp.2d 254, 258 (D. Mass. 2011).

A discharge under § 6325(b)(3), then, would be prudent "where the IRS is unsure of the value of the property or of the lien." *Hannon v. City of Newton ("Hannon II")*, 2012 WL 4390527 at *4 (D. Mass. Sept. 24, 2012). By contrast, a discharge under § 6325(b)(2)(A) makes sense where "the value of a property is undisputed and the government wants to ensure expeditious payment of the value of its interest to be discharged." *Hannon*, 820 F.Supp.2d at 258.

Taking Candor's pleadings at their word, the Government's assertions, and the evidence before it, it's sufficiently clear to the Court that the IRS's lien on Crownhill was discharged under § 6325(b)(2)(A), not § 6325(b)(3). Candor's client sold Crownhill to satisfy, or at least pay down, outstanding tax liabilities, and there is no indication that the IRS retained a lien on the sale proceeds going forward. (*See* Pobre Decl. ¶ 5; Candor Decl. ¶ 15; Opp'n Br. at 1, 7.). Without an actual agreement under § 6325(b)(3), there can't be a claim under § 7426(a)(3), and the Court lacks jurisdiction. The claim is therefore **DISMISSED WITH PREJUDICE**. Candor has requested an evidentiary hearing, and the Court can allow for discovery that informs its own subject matter jurisdiction, but the Court sees no reason to allow either simply to confirm that there was no § 6325(b)(3) agreement.

**III.   Conclusion**

The Court finds that there was no levy on Candor's client's home, nor that the Government discharged its lien on the home pursuant to an agreement under 26 U.S.C. § 6325(b)(3). As a result, §§ 7426(a)(1) and (a)(3) are not triggered, and the Government has not waived sovereign immunity with respect to Candor's claims. This means the Court lacks jurisdiction to consider them. This case is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

DATED:  February 17, 2014

**HONORABLE LARRY ALAN BURNS**
United States District Judge